EARL F. TRINCIA,

*Complainant,*

LOUIS TRINCIA,

*Intervening Complainant,*

*vs.*

OLYMPIA TESTARDI and GUIDO TRINCIA, Administratrix and Administrator, respectively, of the Estate of Giovanni Trincia, also known as John Trincia, deceased, and FLAVIANO CALVARESE, the said Giovanni Trincia, now deceased, and the said Flaviano Calvarese, late trading under the firm name and style of T. & C. BAKING COMPANY, DANIEL DE PACE, OLYMPIA TESTARDI and GUIDO TRINCIA, individually, NORMA CALVARESE, MARY MC-DONNELL, FRANK CALVARESE and EMEDIO CALVARESE,

*Defendants.*

*New Castle, February 28, 1948.*

*James R. Morford* of the firm of Marvel and Morford, and *Morton E. Evans* for complainant.

*Frank L. Speakman,* trustee for Louis Trincia, for Louis Trincia co-complainant, intervener.

*H. Albert Young,* for Flaviano Calvarese, Frank Calvarese and Emedio Calvarese, certain defendants.

*Anthony F. Emory,* for Olympia Testardi and Guido Trincia, administratrix and administrator, respectively, of estate of Giovanni Trincia, Daniel De Pace, Olympia Testardi, Guido Trincia, individually, Norma Calvarese and Mary McDonnell, certain defendants.

SEITZ, Vice-Chancellor: This is the determination after final hearing of the complainant's right as one of the heirs at law of the deceased partner to maintain this accounting action against the surviving partner, even though there is an administrator (intended to include the administratrix) for the estate of the deceased partner.[1]

This court concluded at the demurrer stage[2] that the

---

[1] Louis Trincia, one of the heirs at law and next of kin of the deceased partner, was declared legally incompetent after the final hearing. His trustee, Frank L. Speakman, Esquire, has caused him to intervene as a co-complainant in this cause, and has adopted the original bill of complaint as his own with certain exceptions. It is unnecessary to enumerate the exceptions, except that the co-complainant does attack the request of Edward A. Campbell, one of the appraisers, for a fee of $3,500 on the ground that it is grossly excessive.

The remaining heirs at law and next of kin of the deceased partner were added as parties defendant after the hearing. The same is true of Frank and Emedio Calvarese, two of the sons of the surviving partner.

[2] Since this case arose before January 1, 1948, the effective date of the new *Chancery Court Rules*, I shall employ the old pleading terminology. Also, this case is not being decided under the now existing *Uniform Partnership Act. Rev. Code*, 1935, §§ 3389-3397; §§ 3398-3406 II, as added by 46 *Del. Laws*, c. 229.

factual allegations of the bill of complaint were sufficient to entitle the complainant to maintain this action for an accounting. *Trincia v. Testardi, ante p.* 42, 52 *A.* 2*d* 871. Complainant now insists that the proof demonstrates that he proved such allegations while certain defendants, who include the administrator and the surviving partner, urge to the contrary.

Complainant contended on demurrer and now contends that no more than a demand of and refusal by the administrator to bring an accounting action against the surviving partner is necessary to sustain a derivative action. However, I decided on demurrer that the allegations of the bill of complaint, fairly read, showed not only what amounted to a demand to sue and a refusal, but additional circumstances which justified the court in considering the case as one entitling complainant to sue under an exception to the general rule. *Trincia v. Testardi, supra.*

On the basis of the testimony, I conclude that there was what amounts to a demand and refusal[3] plus those additional circumstances which entitle the complainant to maintain this derivative action. A sufficient number of the alleged facts which I relied upon as being sufficient on demurrer to entitle the complainant to maintain the derivative action were proved at the final hearing. Thus, I conclude that the alleged facts mentioned in numbered paragraphs 1 and 4 of my opinion on demurrer (*ante p.* 42, 52 *A.* 2*d* 878) were proved and consequently, my discussion as to the effect of such facts is here pertinent. In my opinion the existence of these facts, plus those developed at the trial, are sufficient to sustain this derivative action.

While I find the alleged facts mentioned in numbered paragraph 2 (*ante p.* 42, 52 *A.* 2*d* 878) of my opinion on demurrer were proved—continued operation of business by surviving partner—nevertheless, I specifically do not now

---

[3] In view of this conclusion, the administrator's plea that there was no refusal to sue must fall.

decide whether such action was warranted by the surrounding circumstances. Consequently, I do not rely on such facts as a partial basis for this action. Moreover, I shall make no finding at this time as to the effect of the alleged facts appearing in numbered paragraph 3 of the opinion on demurrer to the effect that the surviving partner has appropriated and will continue to appropriate partnership property to his own use (in an unlawful sense). I do so because the facts at this stage fail to sustain such a contention.

Since I find that the derivative action may be maintained apart from any consideration of the allegations with respect to the actions of Daniel De Pace, Esquire, and since the complainant has conceded that they may be stricken in the event they are unnecessary to sustain jurisdiction, the motion of Daniel De Pace Esquire, to strike the allegations of the bill of complaint with respect to him will be granted.

This brings us to a consideration of the disputed items involved in the partnership account which is here stated up until the dissolution of the partnership by the death of Giovanni Trincia, one of the partners, on March 11, 1946.

Preliminarily, I am impelled to observe that we are here concerned with the operations of a small two-family-controlled baking business run by the parties in a most informal manner—euphemistically speaking. It might be said that the parties placed more reliance on faith than on figures, although in later years they did procure the aid of an accountant. The preceding remarks are necessary if we are to understand the actions of the parties, and in order that we may judge such actions in their own setting rather than in the sometimes artificial light of the court room.

While Giovanni Trincia (denominated the "deceased partner") and Flaviano Calvarese (denominated the "surviving partner") were partners for a great many years

(a corporation for a short time) trading under the firm name of T. & C. Baking Company, nevertheless, we are here concerned largely, if not entirely, with the period of time from January 1, 1941 to March 11, 1946. The surviving partner states an account showing what he believes to be the interest of the deceased partner's estate in the partnership assets. The complainant also states such an account based largely on the conclusions reached by the appraisers who valued the partnership estate pursuant to their appointment by the Register in Chancery under statutory authority. The accounts of the partners are far apart only because of a disagreement as to a few matters.

It would serve no useful purpose to delineate the many items which were examined and set forth in the report of one of the appraisers and in the lengthy testimony before me. The briefs of counsel indicate that the substantial items in dispute are actually few in number.

The complainant contended that the interest of the deceased partner's estate was $23,089.72, while the surviving partner's interest was represented by a deficit of $4,965.89, leaving the net partnership worth on March 11, 1946 (before good will) at $18,123.83. The surviving partner took these figures as a starting point and then attacked certain items which went to make up these aggregates.

This opinion will also commence with the figures relied upon by complainant, and will then proceed to pass upon the propriety of the items therein which the surviving partner attacks.

The first and by far the largest single item in dispute (aside from good will) is the salary paid to the surviving partner during the period under scrutiny. Since "salary" is the term employed, I shall so describe the withdrawals by the surviving partner, without pausing to consider the accuracy or accounting implications of such terminology.

The testimony indicates beyond peradventure of a doubt that the surviving partner received a salary from the part-

nership for a great many more years than are here in dispute, and that the deceased partner did not receive a salary. The testimony is also equally clear that the deceased partner knew and approved of the fact that the surviving partner was drawing such a salary. In fact, on several occasions, he cashed the surviving partner's salary check. Finally, the testimony conclusively shows that the surviving partner did all the partnership work for upwards of twenty years, and that the deceased partner did none. I reach these factual conclusions on the basis of testimony which cannot possibly be within the prohibition contained in *Paragraph 4687* of the *Revised Code of Delaware* 1935 which prevents testimony as to transactions with or statements by the deceased in proceedings by or against an administrator.

The complainant contends that the appraisers properly concluded that the surviving partner was not entitled to draw a salary for the years 1941 to March 11, 1946 (one-half of $14,550 or $7,275). He urges that one-half of the salary so received, being $7,275, was properly added to the interest of the deceased partner's estate in the partnership assets and properly deducted from the surviving partner's interest in the partnership assets by the appraisers. Consequently, he urges that it is properly so reflected in the account which he states. Complainant bases this conclusion on the claimed principle of partnership law existing in Delaware that in the absence of an express contract, one partner cannot draw a salary for work performed for the partnership, even though his work or services are greater or of unequal worth.

Complainant relies heavily upon the Court of Errors and Appeals case of *Reybold v. Dodd's Adm'r.*, 1 *Har.* 401, 415, 26 *Am. Dec.* 401. He contends that the *Reybold* case requires the existence of an express contract in order for a partner to receive a salary (absent agent of the whole agreement) and suggests that the surviving partner is relying upon no more than an implied contract which cannot be recognized under the *Reybold* case. The surviving part-

ner contends that an agreement existed between the part-ners that the now surviving partner should receive a salary. It is not entirely clear from the brief filed on behalf of the surviving partner whether an express or an implied in fact agreement is relied upon by the surviving partner. I assume a finding that either one existed and is enforceable will be equally satisfactory to the surviving partner.

It is true that in *Reybold v. Dodd's Adm'r., supra,* it was stated that

"Without express agreement for compensation to a joint owner or partner, or the positive employment of one of the partners by the others for the transaction of the concerns of the whole and as the agent of the whole, no compensation can be allowed on the authority of ad-judged cases."

The basis for distinguishing between express and im-plied contracts is easier to state than to apply to the facts here present. In *Jones v. Tucker,* 3 *Boyce* 422, 423, 84 *A.* 4, 1012, the Superior Court stated that

"An express contract is one where the terms of the agreement are stated in so many words, and an implied contract is where one party receives benefits from another party, under such circumstances, that the law presumes a promise on the part of the party benefited to pay a reasonable price for the same."

As is indicated in 3 *Page on the Law of Contracts,* §1436, an express agreement is arrived at by words, while an implied agreement is arrived at by acts. Consequently, the difference seems to be only in the evidence by which the agreement is proved.

Much of the confusion in judicial pronouncements on this subject seems to have been caused by a failure to differ-entiate between contracts implied in fact and contracts im-plied in law. Contracts implied in fact are just as much the contracts of the parties involved as are express contracts, and are based on intent inferred from acts rather than words. However, contracts implied in law (quasi contracts) are very different because they will be implied in certain

cases without regard to the actual intention of the parties (e.g., unjust enrichment situations).

It would seem to me that the court in the *Reybold* case was not using "express" agreement in the sense that it was intended to prohibit the enforcement of an implied in fact contract, i.e., one to be proved by the acts rather than by the words of the partners. I feel that by the use of the word "express," the court intended to exclude contracts implied in law. Compare *Hoag v. Alderman,* 184 *Mass.* 217, 68 *N.E.* 199. In other words, they intended to hold that the law would not imply an agreement to pay compensation to a partner merely because he had performed all the services for the partnership. Since the partner in the *Reybold* case who claimed compensation for his services had denied that there ever was a partnership and had been overruled by the court, it follows that the court had no facts before it upon which it could have inferred the existence of an implied in fact agreement between the partners based on their actions. Consequently, I conclude that the Court of Errors and Appeals in the *Reybold* case did not have before it the question of whether an implied in fact contract existed between partners which should be recognized by the court.

Based on my understanding that the difference between an express and an implied in fact contract is only one of proof, I conclude that the evidence entitles me to infer, and I do infer, that an implied in fact contract existed between the partners to the effect that the now surviving partner should receive a salary. If, contrary to my understanding, the evidence before me is even pertinent to the determination of the possible existence of an express contract, then I infer that an express contract to the same effect existed between the partners.

It follows that the account as stated by the complainant and the appraisers should be adjusted by subtracting $7,275 from $23,089.72 (complainant's original evaluation of the deceased partner's interest), and by adding that sum to the interest of the surviving partner in the partnership.

When this is done, we find that, before good will, the deceased partner's interest is $15,814.72, and the surviving partner's interest is $2,309.11.

The surviving partner next attacks a portion of an item captioned "Loans and Exchanges" amounting to $5,500, which appears as being due to the deceased partner. The surviving partner admits that $3,500 of this sum is properly stated, but denies that the additional $2,000 is owing to the deceased partner's estate. It appears quite clearly from the evidence that the $2,000 item attacked by the surviving partner, and set up on the books of the partnership which were opened on January 1, 1941, is a part of the $3,500 obligation, and was, therefore, improperly added by the complainant and the appraisers to the $3,500 obligation. The testimony, particularly that of the accountant for the partnership, to the effect that the $2,000 item was a part of the $3,500 obligation, was not rebutted by any substantial evidence to the contrary. Consequently, the surviving partner properly reduced the $15,814.72 figures representing the interest of the deceased partner's estate by $2,000—representing the erroneous increase in the Loans and Exchanges account in his favor. Since the surviving partner was charged with this $2,000 item by the complainant and the appraisers, it follows that he properly added $2,000 to his interest in the partnership. When these adjustments are made, we find that the interest of the estate in the partnership is $13,814.72, and the interest of the surviving partner is $4,309.11.

The surviving partner originally denied that there was due "Accounts Receivable" from Frank Calvarese the sum of $1,167.33 and from Emedio Calvarese the sum of $318.61, or a total of $1,485.94. These items represent withdrawals against profits on the theory that Frank and Emedio Calvarese (sons of the surviving partner) were not only employees of the partnership, but partners at least as to profits.

A court approved stipulation has been filed in this case since the hearing by which Frank and Emedio Calvarese,

as well as all the remaining heirs at law and next of kin of the deceased partner, have been made parties. The stipulation also compromises the items involved in the contention and denial that Frank and Emedio Calvarese and Guido Trincia were partners in the profits and losses of the business. The stipulation compromises the matter by providing:

"That all credits or debits appearing on the partnership books purporting to reflect a participation or right to a participation by Frank Calvarese and/or Emedio Calvarese and/or Guido Trincia in the profits or earnings of said partnership at anytime and in the capital assets of said partnership now existing be cancelled and be not considered in arriving at a determination of the respective interests of the partners in this proceeding; that any advances or payments made to Frank Calvarese and Emedio Calvarese and shown on said partnership books as in the nature of drawings against book profits and any and all monies due from Guido Trincia appearing on the books as a charge against him shall be treated as monies properly paid to Frank Calvarese and Emedio Calvarese and shall be cancelled as to Guido Trinicia."

The complainant's account was premised on the conclusion that Frank and Emedio Calvarese and Guido Trincia were never partners. Consequently, the account shows the alleged withdrawals against book profits in the sum of $1,485.94 by Frank and Emedio Calvarese as an account receivable by the partnership. In order to give effect to the compromise contained in the stipulation, it is necessary only to deduct this item from accounts receivable, with a consequent reduction in the value of the partnership estate. We thus deduct the sum of $1,485.94 from the previous total partnership value of $18,123.83, leaving the partnership estate with a value of $16,637.89. The respective interests of the partners must each be reduced by one-half of the sum of $1,485.94 which has been taken out of the partnership estate. When this is done, we find that the interest of the deceased partner's estate is $13,071.75, while the surviving partner is entitled to $3,566.14, or a total partnership estate of $16,637.89. The account, therefore, properly reflects the adjustments showing only two partners as to capital and profits.

Finally, we come to the item of a $2,400 note due the Farmers Bank of the State of Delaware which the appraisers and the complainant considered as a partnership liability, and which the surviving partner contends is a personal obligation. I conclude from the evidence that the surviving partner is correct in stating that this note is a personal obligation. Moreover, the bank so considers it. Consequently, the sum of $2,400 should be added to the partnership value because this was incorrectly charged as a partnership obligation, which leaves the partnership with a value before good will of $19,037.89. Since the surviving partner's account was charged by both the complainant and the appraisers in their accounts with this liability as being due from him to the partnership, it follows that the sum of $2,400 should be added to his interest in the partnership, which makes his total interest therein amount to $5,966.14, while the estate's interest remains $13,071.75.

It should be noted that all parties now agree that the account stated by the complainant properly included a mortgage receivable from the Blue Hen Athletic Association on which there was then owing the sum of $6,000. This mortgage is now of record in the names of the deceased partner and the surviving partner as individuals, and while the proof demonstrates that it is a partnership asset, it should also be noted that there was no evidence tending to show that the surviving partner denied that the deceased partner owned one-half of this mortgage. Consequently, while it is properly included in the partnership account and therefore increased the partnership interest of the deceased partner, it will not result in any increase in the amount available to the next of kin of the deceased partner from his entire estate, of which the partnership interest is but a part.

One other item which came under scrutiny for the first time at the final hearing must be considered. It is the so-called Mausoleum fund. Such evidence as I heard on this subject indicates that the deceased partner had deposited in the Farmers Bank in the names of the deceased and the

surviving partner as individuals the sum of $8,000 to be used to erect a Mausoleum for the use of their families. He also paid $2,000 directly to a contractor to commence the erection of the Mausoleum. The building of the Mausoleum was held up, and during 1944 the partnership was in such dire need of money that the deceased partner instructed the surviving partner to withdraw money from this fund and use it in the partnership business, and replace it when conditions warranted. Pursuant to such instructions, the surviving partner in the month of August 1944 withdrew $2,000 from the fund on two occasions and used the money in the partnership business. Neither the accountant for the partnership nor the appraisers nor the complainant was aware of the source of this $4,000 and the terms upon which it was turned over to the partnership. Consequently, the accountant for the partnership set the $4,000 up on the partnership books as advances by the deceased partner, and the same procedure was followed by the appraisers and by the complainant in stating the account.

Counsel for complainant has requested that a determination of the proper allocation of this item be deferred until the legal nature of the Mausoleum fund has been determined in an appropriate proceeding. A reasonable time will be allowed for such determination. However, this $4,-000 now appears in complainant's account as an advance by the deceased partner. It must, therefore, be deducted from his interest. Its proper allocation will await the decision in the action to determine the nature of the Mausoleum fund.

Thus, it appears that after holding the allocation of the $4,000 Mausoleum account item in abeyance and before good will, the interest of the deceased partner's estate is $9,071.75, while the surviving partner's interest amounts to $5,966.14. Consequently, upon liquidation of the assets and after readjusting the accounts to reflect the proper method of treating the Mausoleum fund item, the assets

will be distributed in the ratio that the interest of each bears to the total estate.

Other items of partnership accounting were discussed, but I conclude from the evidence that they are not of sufficient substance to result in any change in the account above stated.

Since so much evidence and argument was concerned with the subject of the good will of the partnership, it is pertinent to consider the part, if any, that good will should play in this accounting, especially since it was not carried on the books.

Much evidence was introduced and long arguments were made by both sides with respect to the good will value of the partnership. I am unable to see what beneficial purpose can be served by attempting to evaluate the good will at this time. Thus, we are here doing no more than stating an account and we are not now concerned with the fairness or reasonableness of an offer by the surviving partner to purchase the business. Indeed, the surviving partner has made no offer to buy the interest of the deceased partner, and obviously this court cannot force him to purchase such interest. See *Dougherty v. Van Nostrand, 1 Hoff. Ch. (N.Y.)* 68.

The disposition of the business is further complicated by the fact that the partnership apparently had only a short term lease on the real estate from whence it operated —the fee to such property being in the heirs at law of the deceased partner and now the subject of partition proceedings in the Orphans' Court. Thus, not only is there insecurity as to the physical location of the business, but there are many additional factors which tend to complicate the problem of winding up the partnership.

I have concluded that in view of the strong feeling here involved, coupled with the many unusual factors which can be more dispassionately evaluated by a disinterested person, it would be in the best interest of all concerned to

appoint a receiver to take control of the business with authority to procure the continued operation of the business until he can recommend an advantageous disposition of the assets. The receiver, when appointed, should at the earliest possible moment bring on before the court a recommended course of action looking towards the liquidation of the business.

The receiver to be appointed is also directed to procure from the surviving partner an accounting for the business from the date the partnership was dissolved on March 11, 1946 until the date of the receiver's appointment and qualification.

I am also called upon to consider the question of the costs which may properly be assessed. The fees of the appraisers constitute the major item of costs. Mr. Charles L. Del Campo and Mr. Edward A. Campbell were appointed appraisers by the Register in Chancery pursuant to the then existing *Paragraph* 3402 of the *Revised Code of Delaware* 1935

"* * * to inspect the goods and chattels and such other property as shall constitute the assets of the firm, and to examine all books and accounts of such firm, and to make and file in the office of the said Register in Chancery, within thirty days from the date of their appointment, a true, correct and sworn inventory and appraisement of the assets and also of the liabilities of such firm; * * *."

Since the parties have introduced extensive testimony and have elaborately briefed the reasonableness of the fee requested by one of the appraisers, I shall assume that it is agreed that the court may determine what fees shall be paid the appraisers for their activities as appraisers.

One of the appraisers was Mr. Del Campo who submitted a bill for $150. No one has attacked the reasonableness of his request, and since it appears from the testimony and records to be reasonable, it will be allowed.

The second appraiser was Mr. Campbell who submitted a bill for $3,500. Mr. Campbell, while not a certified public

accountant, is a registered accountant in Maryland. He testified at length as to the services which he rendered, and for which he now seeks to be recompensed. Not only did he file the appraisal along with Mr. Del Campo, but he also filed an elaborate "Report on Examination" of T. & C. Baking Company. While such a report is obviously not provided for by the statute pursuant to which he was appointed appraiser, he contends that such a report was necessary if he was to do what was required of him under the above quoted language of *Paragraph* 3402 of the *Code*. The intervening co-complainant the administratrix and administrator, and the surviving partner take the view that the charge is grossly excessive, while the surviving partner also urges that Mr. Campbell went far beyond his statutory authority in preparing such a report, and that his activities showed that he was biased and prejudiced in complainant's favor in the performance of his duty.

I have given careful consideration to the work done by Mr. Campbell, and have examined the testimony on this point at some length. I conclude that not only did Mr. Campbell do a great deal of work which was not required of him under his appointment as appraiser, but that in performing his duty he often lacked that impartiality which should have characterized his every action.

It was the duty of the appraisers to file a correct inventory and appraisement of the assets and liabilities. While this necessitated certain investigation and accounting activity, it seems to me that Mr. Campbell went far beyond the reasonable requirements of his duty as appraiser. Certainly, appropriate indications of questionable items would have been sufficient for their purposes since the appraisal had no legal finality. Moreover, Mr. Campbell must have become aware quite soon that the partnership assets were much too small to be burdened with a fee of the size which he now requests. Reason would have indicated the need for procuring some further assurance from the Register

in Chancery that he should proceed with the investigation on such an elaborate scale.

Also in some instances Mr. Campbell failed to approach the problem with complete impartiality. Some examples will show the basis for my conclusion. Mr. Campbell concluded from a most cursory investigation that the deceased partner exerted as much effort in the partnership affairs · as did the surviving partner. Assuming that this was a proper matter for Mr. Campbell to consider, it is inconceivable that, acting impartially, he would—as he did—use such an alleged fact as the basis for concluding that the surviving partner was not entitled to a salary without even asking the surviving partner why he had received a salary and why the deceased partner had not. Also, Mr. Campbell valued the good will of the partnership business without even giving consideration to the fact that the business was located on leased real estate. Other evidence shows a preoccupation with the interest of the deceased partner's estate.

I conclude, therefore, that Mr. Campbell not only exceeded his authority as appraiser and to that extent performed unnecessary work, but that he was not always impartial in the performance of his work. However, I do not feel that Mr. Campbell's services should go without any compensation since he was appointed by the Register in Chancery pursuant to statutory power, and did perform services of value. However, in view of my conclusions, I believe that his request for compensation is excessive. The sum of $600 will be adequate compensation for his services under the circumstances.

Since the work of these appraisers was required by statute and was for the benefit of the entire partnership estate, I see no reason why these costs should not be assessed against the partnership assets. It must be kept in mind that the work for which the appraisers are now being paid was completed before this litigation was even instituted. Moreover, the accounting and business defects which neces-

sitated the extra work of the appraisers was largely a joint responsibility of the partners. The aggregate fee of the appraisers amounting to $750 will, therefore, be assessed against the partnership assets before distribution. I do not mean to suggest, however, that such costs should be so assessed in every partnership dissolution, but I feel that the work done was equally beneficial to the estate of the deceased partner and to the surviving partner, and that the respective net assets are not so disproportionate as to warrant some other allocation.

The attorney for the complainant has also requested a fee, and since this has been sustained as a derivative action, I see no reason why the fee should not be permitted by analogy to stockholders' derivative actions. Compare *Perrine v. Pennroad Corporation, et al.,* 29 *Del. Ch.,* 423, 51 *A. 2d* 327. Therefore, complainant's attorney is entitled to be paid a fee (on his derivative action theory) to the extent, if at all, that his services created or preserved some interest of the deceased partner's estate in the partnership assets. This can best be accomplished here by making pertinent comparisons after the accounting and liquidation have been completed. Consideration of this application will, therefore, be deferred until that time.

The parties have also argued whether certain other costs are properly taxable, and if so, against whom they should be taxed. Consideration of these problems will also be deferred until liquidation of the partnership is complete. The right of the deceased partner's estate to receive interest on its share of the partnership assets, or to receive a share of the profits, if any, will likewise be postponed until after liquidation, since the determination of this problem may well turn on whether or not the surviving partner should have liquidated the business before he was replaced by a receiver. Other costs will be taxed at an appropriate time.

An order accordingly will be advised on notice.