NETTIE M. LUTZ and MANAGED FUNDS, INC.,
Plaintiffs,

*vs.*

LLOYD E. BOAS, J. JOHN BROUK, ROBERT A. HICKS, JAMES J. MULLEN, JR., JEFFERSON J. REBSTOCK, DR. EARL RICE, W. MUNRO ROBERTS, JR., HILTON H. SLAYTON and HOVEY E. SLAYTON, LEO MODEL, ROLF R. ROLAND, FRITS MARKUS, ROBERT R. ROSENBERG, WALTER H. BERTON, WALTER S. MORRIS, ERWIN WOLFF, HERMAN H. STONE, STEPHEN M. JAQUITH, ELLIOT D. FOX, JR., and FRANK L. THOMPSON, individually and as partners doing business under the firm, name and style of MODEL, ROLAND & STONE, JAMES S. STUBBS and HAROLD W. SMITH, and SLAYTON ASSOCIATES, INC.,
Defendants.

*New Castle, May 25, 1961.*

*Richard L. McMahon,* of Berl, Potter & Anderson, Wilmington, and *R. Walston Chubb, Robert S. Allen, Dominic Troiani,* of Lewis, Rice, Tucker, Allen & Chubb, St. Louis, Mo., for plaintiff, Managed Funds, Inc.

*William E. Taylor, Jr.,* Wilmington, and *Abraham L. Pomerantz* and *Jerome T. Orans,* of Pomerantz, Levy & Haudek, New York City, for plaintiff, Nettie M. Lutz.

*Hilton Slayton, Hovey Slayton* and *Slayton Associates,* St. Louis, Mo., pro se.

*Robert H. Richards, Jr.*, of Richards, Layton & Finger, Wilmington, and *Arthur H. Dean* and *Marvin Schwartz*, of Sullivan & Cromwell, New York City for defendants, Model, Roland & Stone, Leo Model, Rolf R. Roland, Frits Markus, Robert Rosenberg, Walter H. Berton, Walter S. Morris, Erwin Wolff and Herman H. Stone.

*John VanBrunt, Jr.*, and *E. Dickinson Griffenberg, Jr.*, of Killoran & VanBrunt, Wilmington, for defendant, Dr. Earl Rice.

Defendant Jefferson J. Rebstock did not appear; jurisdiction limited to stock seized.

The other defendants were not subject to this court's jurisdiction.

SEITZ, Chancellor: Originally, this was a stockholder's derivative action for the benefit of Managed Funds, Inc. ("Funds"), a mutual fund. Subsequently, Funds was realigned as plaintiff and given primary control of the case. The defendants who are before the court fall into three groups:

1. Hilton Slayton ("Hilton") and his cousin Hovey Slayton ("Hovey"), who were the founders of Funds in 1946; their wholly-owned investment advisory company, Slayton Associates, Inc. ("Associates").

2. The partnership and eight of the individual partners of the New York brokerage firm of Model, Roland & Stone ("Model").

3. Dr. Rice, a former director of Funds. The defendant, Rebstock, also a former director of Funds, had his shares in Funds seized but did not appear. These were so-called non-affiliated directors. The other non-affiliated directors were not subject to this court's jurisdiction.

Neither of the Slaytons' sales companies, Slayton and Company, Inc. ("Slayton Inc.") and Mutual Fund Distributors, Inc., is a party defendant here. Each was at all times owned 51% by Hilton and 49% by Hovey and both were the principal officers and directors of Slayton, Inc.

Before launching into a narration of the actions of the various defendants of which plaintiffs complain, it is pertinent to describe

Funds. It was organized in 1946 as a Delaware corporation. It is an open-end investment company registered under the *Investment Company Act* of 1940 (15 *U.S.C.A.* § 80a-1 *et seq.*) ("Act"). It operated out of St. Louis, Missouri, around the idea that the new fund would realize capital gains and distribute them and the income quarterly to their shareholders in relatively level amounts. Funds offered several classes of shares which concentrated their investments in different industry groups. Its shares were widely distributed and its assets were valued at close to $80,000,000 when, in 1959, the S. E. C., held public hearings to determine whether a registration filed by Funds was false and misleading. This action followed and is based to a large extent on the disclosures there adduced.

Hilton, the president and dominant figure of both Funds and Associates, had a great deal of experience with mutual funds when he formed Funds. Hovey is involved, but his conduct was largely that of a Hilton follower. While not technically a securities analyst, Hilton was quite conversant with the important aspects of securities management. Throughout the period here involved, the Board of Directors of Funds consisted of nine persons. The non-affiliated directors were nominated by Hilton or his friends.

In 1945, Hovey, who was also experienced in selling mutual fund shares, joined Slayton Inc. After Hilton and Hovey organized Funds, Slayton Inc. became the exclusive sales organization or "underwriter" and investment adviser for Funds. Associates succeeded Slayton Inc. as investment adviser on August 15, 1952, when a "Funds Management Agreement" ("Agreement") was executed by Funds and Associates and was approved by the stockholders of Funds. Like the earlier management agreement between Funds and Slayton Inc., it was for a period of two years, and was also subject to annual renewal by the directors. While it contained a termination provision, it was in fact renewed from year to year. Under the Agreement, which remained in effect throughout the period here pertinent, Associates agreed to furnish Funds, "* * * advisory, research and statistical services as required in accordance with the provisions of the Certificate of Incorporation and the investment policies adopted and declared by

its Board of Directors". Associates was to be paid for its services one-half of one per cent per annum on the average of the daily net asset value of Funds.

At the time Funds and Associates executed the Agreement, Associates had one employee, Boll, who was a full-time security analyst. It also had a contract with one Jacob Baker of the Econometric Institute. Both of these men plus Hilton and Hovey received salaries from Associates, although Hovey's contribution was apparently minimal.

It is necessary next to turn from St. Louis to New York to pick up another important actor in this drama. In April 1952, one Stephen Jaquith ("Jaquith") was employed by Model, a New York brokerage partnership, to manage an investment advisory department just being created. At that time Model had several partners and associates but Jaquith was not made a partner. Model specialized in European securities and had a limited contact with so-called American securities. It did, however, advise several substantial American accounts.

Jaquith had a fine academic record and a reputation as a brilliant securities analyst. He had been in business for himself as an investment counselor and had rendered advice, inter alia, to an investment adviser to a mutual fund. Because of a change of management he lost that position. When he joined Model he registered with the New York Stock Exchange as a salesman and representative. He was to be paid a salary and bonus by Model, plus a commission of 40% of each brokerage fee he produced.

In the fall of 1953, Hilton approached Jaquith about rendering certain services to Associates. After some conferences, Hilton and Jaquith reached an understanding. One James Stubbs, a Dayton attorney, who was a director of Funds and who represented the Slayton companies, drew the contract. Associates entered into the contract with Jaquith, in his individual capacity. Hovey came to know of the agreement in 1954.

The contract, dated December 1, 1953, was to have considerable future significance. Under it Associates employed Jaquith "as an Investment Counselor and Manager of the Securities Portfolios" of

Funds, for which Associates then acted as investment manager. Under its provisions, Jaquith, "under the general direction and approval of the Company [Associates], [was to] use his best judgment in the selection, purchase, and sale of said securities, under the general policy of the Company [Associates], as it may be determined from time to time". The agreement provided further that "In payment of the services so rendered, Company [Associates] will direct brokerage commission business to Stephen M. Jaquith, or to such person, persons or firms, as he may designate in writing * * *" for a five year period in a total minimum amount of $250,000 at a $50,000 per year minimum. There was also a provision for an additional five year period. It was provided that should conditions not reasonably warrant the payments in the first five year period, they would be in effect added to the second five year commitment.

I find as a fact that Jaquith did not disclose the existence of the December 1, agreement to any of the Model partners. He did tell them that he was about to obtain, as a new customer, a St. Louis mutual fund with a $20 million dollar portfolio. He stated further that he hoped to receive substantial amounts of brokerage business.

Nor did Jaquith advise the Model partners of what I shall euphemistically call a "loan" which, I find, he caused his wife, to make to Hilton about that time, at Hilton's instance. He also failed to advise them that in 1955, at Hilton's "suggestion", he caused his wife to make a $42,500 investment in a company organized by Hilton to purchase a parcel of real estate to be used for the erection of a building to be leased to Funds and the Slayton companies. I further find that the Jaquith contract was not disclosed to the non-affiliated directors of Funds.

At first, Jaquith's function was largely confined to making general recommendations of securities he considered attractive. In February 1954, Hilton asked Jaquith to make some specific recommendations concerning stocks, the amounts thereof, purchase prices and the portfolios for which they should be purchased. The board of Funds expressed its appreciation for Jaquith's services in April 1954.

On June 12, 1954, Mr. Boll terminated his connection with Associates. The contact with the Econometric Institute also was termi-

nated. Thus, Associates had no employees except the Slaytons. Up to that date I am satisfied that Jaquith was not buying or selling for Funds or rendering to Funds any substantial amount of the services for which Associates was being paid by Funds.

After June 12, 1954, there occurred a substantial change in the relationship between Associates and Jaquith. Hilton gave Jaquith specific instructions as to the allocation of Funds' brokerage business among several brokerage houses. Under Hilton's instructions 30% to Spencer Trask, 30% to Model, 15% to Bacon Stevenson & Co., 10% to Seligman, Lubetkin, and 15% to miscellaneous firms. The business directed to Spencer Trask was, pursuant to Hilton's instructions to Jaquith, credited to Harold W. Smith, who maintained a small office for Spencer Trask in Manchester, N. H. Smith was a brother-in-law of Hovey Slayton. Pursuant to Hilton's request, Jaquith placed orders with the other brokers by phone but apparently the Model partners were not aware of this practice.

At about this same time Jaquith acquired a direct line from his room at Model to its order room. Model began rendering daily telegraph confirmations of purchases and sales of securities on orders placed by Jaquith with Model for Funds. Funds' custodian authorized its New York correspondent to accept delivery and pay Model direct in New York City.

After June 1954, Jaquith and Hilton had innumerable phone conversations with respect to all facets of the investment world, but particularly concerning stock in different businesses and those which might be bought or sold by Funds. The parties are in dispute as to whether, during the period from June 1954 to 1959, Jaquith only recommended purchases and sales or whether he actually bought and sold without prior approval to any substantial degree. Preliminarily, it seems clear that Hilton as the president of Funds obviously had a continuing responsibility with respect to the purchase and sale of stock for it. He will not be permitted to deny that such discussions were in connection with the discharge of his responsibilities as president of Funds. Model also knew he was president of Funds.

The bulk of the investment transaction over these years (1954-1959) arose from selling programs designed to realize capital gains

and from reinvesting programs. Jaquith was told by Hilton how much money was needed to meet the required distribution of capital gains in each class of shares. Jaquith then, I find, selected a list of securities for possible sale and, sometimes at least, discussed them with Hilton. The same procedure was followed in connection with reinvestments. However, I find that Jaquith bought and sold for Funds generally without specific prior approval from Hilton as to particular securities. Jaquith testified that he could not recall that he had not discussed such securities at some previous time with Hilton. This may have been so but it does not alter the fact that the buying and selling was done without specific prior approval, and was done pursuant to a grant of such power in fact from Hilton after June 12, 1954, although Associates itself did not have such power under its management Agreement with Funds.

In July 1954, Slayton asked Jaquith whether Model would be interested in hiring Harold W. Smith, Hovey's brother-in-law, as a registered representative. Jaquith understood that Model would get the Funds' business then going to Spencer Trask if satisfactory arrangements could be made. Model employed Smith to get the additional business and not because of any particular concern about Smith's attainments or abilities. When Smith was hired it was also agreed between Jaquith and Model that Jaquith would receive a 10% override on the commissions credited to Smith, provided Smith produced commissions of $50,000 a year. This was justified on the basis that Jaquith was servicing the work which created the Smith commissions.

Also, in the latter half of 1954, Jaquith reviewed with a Model partner his relationship with the firm. Even at this early date the Funds' work had become more than Jaquith could handle. Model agreed to hire and pay for a full-time research assistant, provided Jaquith obtained from Funds gross commissions of at least $100,000 a year. Jaquith's commissions were raised from 40% to 50% of the Funds' business provided it reached $100,000 a year.

In the spring of 1955, Hilton asked Jaquith whether Model would consider hiring attorney Stubbs, heretofore mentioned, as a registered representative. Because of his physical condition Stubbs had

gone to Florida to live. It was made clear by Hilton that $50,000 to $60,000 of additional Funds' brokerage business would go to Model if it hired Stubbs. Stubbs was employed by Model on an agreed commission in order that Model could get the additional business. Jaquith also got a 10% override on this business.

As the business grew Model increased its staff assigned to Funds' work until in 1958 it had five other analyists and four secretaries working full time on Funds' portfolio. Some of the expense was shared by Jaquith. Brokerage commissions for the period 1953-1959 were over $2,300,000 of which Model received $1,940,806.72.

Most of the important facts here stated were developed in the S. E. C. investigation of 1959, which was concerned with the issue as to whether the effectiveness of a Funds' registration statement should be suspended.[1] Model was not a party to that proceeding.

Jurisdiction, which is unchallenged, is based on general equitable principles and the Investment Company Act.

Preliminarily, while Hilton, Hovey and Associates (collectively called "Slayton defendants") appeared in this action and denied liability, they did not participate in the trial either personally or through counsel. It would appear that the Slayton defendants are largely if not wholly without assets. However, I must resolve the various issues involving their liability because they are urged by plaintiffs and also because they involve, in part, some of the same issues raised in connection with the claimed liability of Model and the non-affiliated directors.

Parenthetically, Jaquith's legal liability is not being determined because he was not subject to this court's jurisdiction.

### Liability of Slayton Defendants for Management Fees

Plaintiffs first claim that the Slayton defendants are liable for $1,218,926 in management fees which they collected from Funds from December 1, 1953 until termination. They contend that the

---

1. The New York Stock Exchange also took certain punitive action against certain members of the Model firm based on the so-called "nominal" employment of Smith and Stubbs.

Slaytons breached the fiduciary duty owed Funds in many ways. While the Slayton defendants offered no evidence, Model attempted to show that it did not do Associates' work.

The Jaquith-Associates' contract gave Jaquith the power to purchase and sell securities held in the Funds' portfolio under the general direction and with the approval of Associates. This was an unauthorized grant of power, regardless of its scope, because Associates itself did not have the power to make this agreement under the terms of its own Agreement with Funds. Hilton signed the Agreement in his capacity as president of both entities.

Jaquith's contract purported to pay Jaquith by the use of Funds' brokerage business. Under its Agreement with Funds, Associates did not have the power to so commit Funds' brokerage business. Moreover, the Slayton defendants had no right to use Funds' brokerage business to pay for services for which Associates was already being paid. At least it was a situation which cried out for full prior disclosure to the Funds' stockholders. No such disclosure was made.

Under the Jaquith contract, Associates purported to commit Funds' brokerage business to Jaquith for a period beyond that provided in its Agreement with Funds. This was an unauthorized attempt to exercise a power which Associates itself did not possess.

I find as a fact that after June 12, 1954, Jaquith performed substantially all of the services for which Associates was being paid under its management Agreement with Funds. This was clearly a breach of duty in that Associates and the Slaytons took Funds' money for services they did not render.

By breaching their fiduciary duty and exceeding their authorized powers in the ways just described in connection with the payment of management fees, the Slayton defendants are jointly and severally liable to Funds apart from any responsibility created by a breach of the Investment Company Act of 1940.

What is the measure of recovery against the Slayton defendants on this phase of the case? The Slaytons, through Associates, caused Funds to pay money for services which it might well have received

solely for brokerage commissions. At least, that possibility should have been submitted to the stockholders or the non-affiliated directors. Instead, Associates received the payments after June 12, 1954 without, in my view, rendering for Funds the services for which it was being paid. This practice was not only a breach of fiduciary duty but also made the prospectus misleading. The conscious nature of the acts does not call for any amelioration of the remedy. The Slayton defendants will be held jointly and severally liable for all management fees received after June 12, 1954. It, of course, follows that the counterclaim of Associates is denied.

### Liability of Slayton Defendants for Brokerage Commissions Received by Model

I come now to the liability of the Slayton defendants in connection with the commission payments received by Model on Funds' business. I shall not dwell too long here because I am satisfied that the Jaquith contract rendered Jaquith an "investment adviser" within the meaning of Clause B of definition (19) of the Act. I so conclude because I believe the parties operated under it in such a way as to justify the interpretation that Jaquith was empowered to determine what securities should be purchased or sold by Funds. Moreover, after June 14, 1954, the Jaquith staff regularly furnished advice to Associates, and indeed, to Funds, with respect to the desirability of investing in securities. The factual basis for this conclusion is found in this opinion.

Having failed to obtain proper approval of the Jaquith contract, it was void. The Slayton defendants thus lost their rights thereunder. What should Funds recover? Plaintiffs say it is the full amount of the commissions paid by Funds to Model. It seems to the court that when a flagrant breach of the Act is found, a drastic remedy is in order. Taking the word "void" as used in the Act to have some added weight, I conclude that the Slayton defendants are liable for the full commissions paid Model after the execution of the Jaquith contract in December 1953. However, it does not seem equitable to require the Slayton defendants to repay both the management fees and the brokerage fees. I decide therefore that the corporate plaintiff must elect one or the other as the basis of liability.

### Liability of Model for Brokerage Commissions
### Paid by Funds

I turn now to the charge that Model must also be held jointly and severally liable with the Slayton defendants for the brokerage commissions received from Funds. Plaintiffs charge that Model acted as an "investment adviser" under the Act without procuring the requisite approval. The result is that their agreement was void and their liability complete.

The Act defines an investment adviser as follows (15 *U.S.C.A.* § 80a-2(a) (19):

"(19) 'Investment adviser' of an investment company means (A) any person (other than a bona fide officer, director, trustee, member of an advisory board, or employee of such company, as such) who pursuant to contract with such company regularly furnishes advice to such company with respect to the desirability of investing in, purchasing or selling securities or other property, or is empowered to determine what securities or other property shall be purchased or sold by such company, and (B) any other person who pursuant to contract with a person described in Clause (A) of this paragraph regularly performs substantially all of the duties undertaken by such person described in said clause (A) ; but does not include (i) a person whose advice is furnished solely through uniform publications distributed to subscribers thereto, (ii) a person who furnishes only statistical and other factual information, advice regarding economic factors and trends, or advice as to occasional transactions in specific securities, but without generally furnishing advice or making recommendations regarding the purchase or sale of securities, (iii) * * *".

I agree that the Model partners did not have actual knowledge of the Jaquith contract and I also agree that as time went by the Jaquith contract became unimportant to the thinking of the parties thereto because the growth of the business far outstripped the situation visualized in the Agreement. But this does not dispose of the matter for reasons I shall now discuss.

Model argues that it was not an "investment adviser" because it had no contract with either Funds or Associates, as the Act requires. Model concedes that such a contract need not be in writing but argues that there must be a contract. Was there a contract between Funds and Model?

I am satisfied from the evidence that after June 12, 1954, a contract implied in fact existed between Model and Funds by which Model, in return for commissions on brokerage business, regularly furnished advice to Funds with respect to the desirability of investing in, purchasing or selling securities. Model says either Model or Funds was free to terminate their relationship at will and thus there could be no contract. The arrangement does not preclude the finding of a contract of the type mentioned based on a well established course of conduct. Compare *Trincia v. Testardi*, 30 *Del.Ch.* 182, 57 *A.2d* 638; 1 Williston on Contracts (3rd ed., Jaeger), § 3. Certainly, the provisions of the Act requiring approval of the investment adviser's contract cannot be frustrated by the mere absence of a formal written contract if the evidence shows a contract implied in fact between the pertinent parties. To adopt Model's approach would be to permit the parties to determine "by form" whether or not they desired to be covered by this phase of the Act. To state this possibility is to reject it in view of the purposes of the Act.

My conclusion that a contract was made by the parties is based on the following findings of fact: Model was told initially that Funds was Jaquith's new customer; Hilton was, to Model's knowledge, the chief executive officer of Funds; after June of 1954, Model knew that Associates was paid a large fee as investment adviser and also knew that its own substantial Managed Funds' department was providing most of such advice to Funds; a Model partner checked the order room and was aware of the volume of business; Funds' chief executive officer had caused substantial brokerage business to be diverted to Model in return for the "nominal" employment of persons in whom he had a personal interest, all to Model's knowledge; Model had paid Jaquith an "override" on such business because Jaquith was "processing" such accounts, Model made such arrangements directly with Hilton. Jaquith acted only as an intermediary.

The foregoing facts, in the setting, compel the conclusion that Model had a "contract" with Funds within the statutory use of that term. In reaching this conclusion, I do not rely on the facts adduced at the S. E. C. hearings, to which Model was not a party. The contract which I find existed in fact between Funds and Model was not approved as required by the Act under § 80a-15(c). In consequence, it was unlawful under § 80a-15(a) and was void under § 80a-46(b) thereof. It also violated § 80a-15(a) because it was not in writing. Finally, it was contrary to Section 3(D) of Funds' Certificate of Incorporation, requiring that such contracts be in writing and approved by the stockholders. My conclusion makes it unnecessary to consider whether Model was an "investment adviser" because of the Jaquith contract.

Plaintiffs claim that the only way to implement such a decision under the Act is to require Model to repay Funds all the commissions received on the various purchases and sales. Model argues that plaintiffs can show no damage.

█ I am satisfied that, by analogy, *Goldstein v. Groesbeck*, 2 *Cir.*, 142 *F.2d* 422, 154 *A.L.R.* 1285, calls for a recovery from Model. I say this because any other approach would frustrate the implementation of the policy behind the Investment Company Act of 1940, insofar as it is made clear therein that the public interest and the interest of the investor are adversely affected when investment companies are operated in the interest of brokers, etc. Model, in my view does not successfully distinguish the Goldstein case. Nor does Section 17(e) of the Act preclude recovery. It merely limits, inter alia, commissions to the usual amounts. It does not automatically permit a broker to keep the "usual" commissions if he has violated other portions of the Act.

Model argues that the Act does not forbid fair compensation to an investment adviser who violates the Act, citing In the Matter of *Investors Diversified Services, Inc. (September* 22, 1949), *C.C.H. Fed.Sec.Rep.* § 76,022. That decision by the Commission constituted nothing more than the removal of a statutory bar to the completion of a settlement involving such an established claim. It was not a deci-

sion as to the extent of relief in an adjudicated case. Indeed, the opinion says that it was adjusted on a "cost" basis. It might mean that it was the broker's actual costs and not the amount of the usual brokerage fees.

Model says that there is no proximate cause between its violation of the Act and plaintiffs' claimed damage to Funds, citing *Downing v. Howard, 3 Cir.,* 162 *F.2d* 654. That case involved an attempt to hold the Company liable for decreases in the value of its assets during the period when it failed to register as required by the *Public Utility Holding Company Act,* 15 *U.S.C.A.* § 79a et seq. The court could find no connection between the two situations. I agree. But here Model profited from its illegal actions. One can only speculate as to what the stockholders might have decided had the investment advisory arrangement been submitted for approval, particularly in view of the contemporaneous payments being made to Associates for the same service. *Restatement of Torts,* § 286, cited by Model, under the facts as I find them, supports rather than negates the granting of a recovery here.

The parties have cited numerous authorities in various fields of law dealing with the measure of damages but I do not find anything precisely in point. The case of Goldstein v. Groesbeck, above, came up to the issue but did not resolve it under a similar provision in the Public Utility Holding Company Act of 1935. The issue was there formulated in terms of whether the damages were to be the return of the full consideration paid or the difference between the consideration paid and the value of the services received. Since Model only charged such brokerage commissions as would have been charged by any other broker, it seems obvious that there can be no recovery if the court is to adopt the view that the damages are the difference between the consideration paid and the value of the services received.

In my view the traditional "damage" approach is not permissible herein implementing the policy incorporated in the Act. I conclude that an offending party of the type here involved may not profit from this type of violation of the Act. The issue then, as I view it, is whether Model should be required to return all of the commissions

received on Funds' business after June 12, 1954, or only the difference between the commissions received and the proper costs of operation. Absent any authoritative ruling under the Act or any comparable act, as an equity judge, I am inclined to adopt a measure of recovery here which will deprive the partnership of any benefits but will allow a "credit" for its proper expenses.

I conclude that Model must pay Funds the difference between its expenses (properly allocated) and the commissions received by it after June 12, 1954. I next consider the proper expense items to be considered in arriving at Model's ultimate liability.

The partners' remuneration should be eliminated from expenses because it is in effect a "profit" item. In determining its expenses, should Model be allowed credit for any of the payments made to Jaquith, Smith and Stubbs? I believe the answer is found by determining how far the court should go in implementing the salutary purposes of the Investment Company Act.

As to Jaquith, it must be remembered that Model did not know of his agreement with Associates. In addition to his 50% commission for Funds' business, Jaquith was paid a so-called override on the Smith and Stubbs accounts on the theory that he was servicing them. Stripped of its euphemism, this arrangement was nothing more nor less than a payoff to Jaquith because he brought the additional business to Model. Under the circumstances, I think it is not proper to permit Model to deduct these override payments in computing its net profit. Otherwise, I am satisfied that the Jaquith payments should be deducted.

As to the payment to Smith and Stubbs, I find that, to Model's knowledge, these allowances were not for true brokerage service rendered. Rather, the commissions were paid with the full realization that Smith and Stubbs were in reality not expected to perform any of the services for which the commissions were being paid. Thus, brokerage business of Funds was used, with Model's cooperation and knowledge, for Hilton's purely personal purposes. Considering the purposes of the Investment Company Act, I think it inappropriate to permit Model to deduct the Smith and Stubbs payments in determin-

ing its net profit for the purpose of ascertaining the proper recovery here. Unless, plaintiff promptly raises some issue concerning it, I shall accept the other expense items set forth in the pertinent exhibit filed by Model.

Next, a word should be said concerning Model's alleged liability for commissions during the period between December 1, 1953, when the Jaquith-Associates' contract was signed, and June 12, 1954, when Model, in my view, became an "investment adviser" under the Act. During this period neither Jaquith nor Model bought or sold for or rendered substantial investment advice to Funds or Associates. Thus, the violation of the Act during that period consisted of the execution of the Jaquith contract without director or stockholder approval. However, Model had no knowledge of the contract and did not gain an abnormal benefit therefrom. I do not believe the facts render Model liable under the principal-agent theory. Nor can Model be held liable under the doctrine of ratification. I say this because it had no knowledge of the contract. Nor did the facts fairly put it on notice as to its existence. Thus, Model cannot be held to any liability during the period under discussion.

### Liability of Model for Management Fees

I next consider the plaintiffs' claim that Model is jointly and severally liable with the Slayton defendants for the sums paid by Funds to Associates for management fees. In resolving this issue I make the following findings of fact:

1. Model knew of the relationship between Funds and Associates and the connection of the Slaytons thereto.

2. Model knew that Jaquith's department in Model was serving only Funds.

3. Model knew that Associates was receiving substantial compensation for rendering management services to Funds.

4. Model knew that after June 1954, its department was doing most of the work, for which Associates was being paid.

Do the foregoing facts, when considered in conjunction with the nature and size of Model's organization, render Model liable for payments made by Funds to Associates after June 1954?

In answering the question posed, I assume that Model's liability is governed by New York law.[2] I say this because Model's connection with the transaction stemmed almost entirely from its activities within New York State. Under that law a person who knowingly participates with a fiduciary in a breach of trust is equally liable for the damages caused thereby. *Wechsler v. Bowman*, 285 *N.Y.* 284, 34 *N.E.2d* 322, 134 *A.L.R.* 1337. I am satisfied that Model, after June 12, 1954, must be held to have known that it was doing the work for which Associates was being compensated. I further find that it remained silent and continued to participate with Associates and its dominant personality, Hilton Slayton, because any other course would have jeopardized the lucrative account. Model argues that it had no duty to take any affirmative action in this situation. Assuming that it had no affirmative duty, it does not necessarily follow that it did not have a responsibility to refrain from conduct which made it a conscious and cooperative party to a breach of fiduciary duty. To this should be added my finding that Model was an investment adviser to Funds after June 1954. These actions by Model rendered it less likely that the stockholder and non-affiliated directors would become aware of this continuing breach of duty by the Slaytons.

What is Model's liability under this head of the case? I have already determined that Model should repay to Funds all profits made on the Funds' brokerage business received after June 12, 1954. This, I believe, is compelled by the policy basis of the Act. In considering Model's liability in connection with Funds' payments to Associates, I believe that Model's liability should be governed solely by general principles of equity. Those principles do not, under the present circumstances, require that Model be held liable for the payments made by Funds to Associates except to the extent, if any, that such payments after June 12, 1954, exceed the amount which under my ruling, Model will be required to repay Funds from commissions re-

2. I do not consider whether Model's conduct also placed it in violation of the Act.

ceived. My approach will, in effect, result in Funds having received back all payments improperly made to Associates and having obtained investment advice and brokerage service for the standard brokerage charges, or less. This would seem to do equity under the facts.

### Liability of Slayton Defendants and Model for Excessive Trading and Other Violations of Stated Investment Policy

Plaintiff's next claim that Funds suffered losses due to certain specific sales and repurchases of securities in its portfolio. They also claim that unless the court determines that Funds is entitled to a recovery of all commissions, it is entitled to recover the commissions to the extent the brokerage transactions were excessive. Plaintiffs claim that the Slayton defendants and Model are jointly and severally liable to Funds because (1) the Slaytons and Model participated in the mismanagement of the portfolio for their own benefit; (2) they violated the Act by deviating from Funds stated policy; and (3) damages were the foreseeable consequences of the wrongful acts heretofore found in this opinion.

Model says that there was no "churning" of Funds' portfolio as that term is commonly defined, and that in any event, the turnover was the inevitable consequence of Funds' investment policy which was not illegal. Model says that churning means the inducement of transactions which are excessive in size or frequency in view of the financial resources and character of the customers' account. Taking this definition to be accurate, the court is nevertheless confronted with the clearly established fact that the turnover in Funds' portfolio, at least after December 1956, violated Funds' own investment policy as set forth in its prospectus. The average turnover of various funds generally for the years 1957–1959 was about 25%. Funds' turnover was 44% for 1957, 97% for 1958, and 47.4% for 1959, (adjusted). Model says Funds' turnover must be compared with funds having a similar capital gains distribution policy before the comparison can be fair. I do not agree. I say this because at least after 1956 Funds' stated investment policy was "capital growth" and "normal turnover". The "normal turnover", in its context, fairly implied a comparison with mutual funds generally and not with some isolated Fund also having a high turnover.

The excessive turnover was contrary to Funds' stated investment policy and was a violation of the Act. It also violated general equitable principles because it was contrary to the representations appearing in its prospectus.

Model says the high turnover was an inevitable consequence of Funds' investment policy. Model confuses two factors. The high turnover was not an inevitable consequence of the stated investment policy. It was an inevitable consequence of the actual investment operations of Funds at least after 1956. So the answer is that the investment policy was legal but the operation thereunder was not. I might add that the non-affiliated directors contend that the turnover was the inevitable consequence of Funds' capital gains distribution policy. This was true only because of the manner in which it was implemented. There was nothing in that policy, as stated, which required turnover at a rate which frustrated the overriding policy of "capital growth".

I first consider Model's liability. Should it be required to repay any costs involved in the excessive trading. It is necessary to decide this because Model was only held liable for its profits from the brokerage fees under my earlier ruling herein.

In resolving this issue I make the following findings of fact:

1. Model was an investment adviser to Funds during the period here pertinent.

2. Model was aware that in December 1956 Funds had restated its investment policy to emphasize "capital growth" and that the result of such "restatement of policy could result in but normal turnover in the securities held * * * ".

3. Model was aware of the volume of transactions and is chargeable with knowledge that the excessive trading was contrary to the restated policy.

4. Model was receiving commissions on all such transactions.

The foregoing facts, when considered in conjunction with the magnitude of the Managed Funds' department of Model and its awareness of the consequences of the prior policy, compel me to conclude that Model was a knowing and conscious party to the violation

of the Funds' policy: Model was not in the position of the ordinary broker executing a customer's order. Rather, it was providing the principal advice concerning the purchase and sale of securities for Funds and was executing such orders. Although the facts are admittedly not the same, the language of the *S. E. C.* in *E. H. Rollins & Sons, Inc.,* 18 *S.E.C.* 347, 380, is pertinent:

> "Of course a dealer cannot be held guilty of overtrading in an account where transactions are initiated by the customer. In that case the profit drain on the account is the responsibility of the customer and not the dealer. On the other hand, in order to determine a dealer's culpability for overtrading it is not necessary that we find him to have a discretionary power over the account in a formal sense. The heart of the inquiry is not nomenclature or form but fact. Does the dealer occupy such a status with respect to the customer that he may be held responsible for excessive trading in such customer's account? Or, more specifically, did the respondent Rawls or Rollins, or both, occupy such a status with respect to the funds in this case, and make use of it to induce excessive trading in any of their accounts?"

I am satisfied that Model exercised such a position with respect to Funds' brokerage business that it must be held to have been a party to the excessive trading. An additional reason for the same conclusion is found in its "investment adviser" status.

The issue as to the measure of Model's liability in connection with the excessive trading is not easy. It has already been compelled to give up its profit. Should the court make Model repay the balance of the commissions received (representing its costs) on business deemed to be in excess of the industry average? To do so would require this court to assume that the excessive trading automatically damaged Funds. I do not believe that such a result necessarily follows. I therefore believe that plaintiffs' recovery must be limited to losses and costs incurred by Funds which can be specifically identified.

Plaintiffs have introduced into evidence a chart showing sales and purchases of the same securities within a certain short period of time. Many of those sales were clearly, if not admittedly, to obtain capital gains for distribution purposes. I am satisfied that some of

these losses were the direct consequence of the violation of Funds' "capital growth" investment policy. It does not necessarily follow that a sale and a repurchase is conclusive proof of a violation of Funds' investment policy. However, an examination of the transactions reveals that many could not have been based on legitimate investment judgment decisions. I shall not detail the several cases involving the sale and repurchase of securities at a loss which took place within a short period of time. The only justification for them is found in the need for realized capital gains for dividend purposes. The transactions were contrary to Funds' overriding investment policy.

It seems to the court that an arbitrary period must be selected beyond which it will be assumed that the repurchases were not solely the result of a violation of Funds' policy. Giving Model the benefit of the doubt, I will limit the sale-reacquisition prima facie liability period to 30 days and also limit it to the years 1957, 1958 and the pertinent part of 1959. The 30 day period is arbitrary and is selected as a period which, in time, probably excludes decisions based on legitimate investment considerations. The years used are those subsequent to the restatement of Funds' policy in December 1956. Also, I accept Model's evidence giving a "new information" explanation for certain of the re-acquisitions (Lorillard, Bristol-Myers). I cannot accept the explanation that A. T. & T. was treated as cash by Funds and should not be considered as an investment.

Nor can Model, under the facts of this case, justify its actions here attacked on the basis that Hilton was aware of them or that they represented a small percentage of the total transactions. These were concrete losses incurred because of a violation of Funds' investment policy at a time when Model was aware thereof and an active party thereto.

I conclude that as to the condemned transactions, Model must repay the costs thereof and the losses incurred. I emphasize that the costs should not include the profit made by Model which has already been covered at an earlier stage of this opinion.

There is no exhibit which shows the sales and repurchases in such a way that the damages can now be computed. Such a chart must be prepared and should embrace those losses resulting from

repurchases which can properly be connected with a prior sale. To the extent the parties cannot agree, the court will resolve the matter.

Since I have already held that the Slayton defendants must, if plaintiff elects, repay the entire brokerage commissions covered by the period in question, the only issue is whether they should also be liable for any other costs and the losses incurred in connection with the sales for which I have just held Model responsible. I conclude that the Slayton defendants are also jointly and severally liable for such losses. They are also liable for any costs beyond the commissions paid on such transactions. My conclusion is based upon a finding that the Slaytons were actually aware that these transactions violated their stated investment policy and are charged with knowledge that they were contrary to the Act.

### Liability of Non-Affiliated Directors

I come now to the plaintiffs' claim that the so-called non-affiliated directors who are here parties (one by general appearance and one by seizure of property) are jointly and severally liable with the Slayton defendants and Model for the following items:

1. The unearned advisory fees paid to Associates.

2. The losses resulting from the sale and repurchase of the same securities as determined herein.

3. The commissions paid due to excessive turnover generally.

Preliminarily, it can be said that since I have ruled that there can be no liability based on the mere showing of turnover in excess of the average in the field, the non-affiliated directors are not liable under Item 3.

The non-affiliated directors had the same responsibility as that of the ordinary directors of a Delaware corporation. Their non-affiliated status is a creation of the Investment Company Act, but it does not lessen their obligations.

These non-affiliated directors were concerned with the board for varying periods. Dr. Rice had been a director since 1946 and was a substantial investor in Funds. These men are prime examples of

what can happen when a man undertakes a substantial responsibility with public overtones without any appreciation of his obligation thereunder. Based upon my view of the evidence I make certain findings of fact: these non-affiliated directors gave almost automatic approval to the management Agreement; they did not examine the registration statements carefully; they did not discuss securities at their meetings or discuss any of the other facts which would have been pertinent to a reasonable discharge of their duties; most of the time at the directors' meeting was spent in determining dividends on the basis of work sheets provided by the Slaytons; the directors did not know who selected securities for purchase or sale; they did not inform themselves about the rate of turnover and how the brokerage business was being distributed.

Indeed, on the record made before me, I can adopt the following statement from the S. E. C. opinion as my own; noting that the directors here involved testified at the S. E. C. hearing:

> "The record shows that the board of directors gave scant attention to the management of the registrant; made no efforts to be informed concerning registrant's policies and whether such policies were being followed; made no decisions concerning purchases and sales of portfolio securities; and generally permitted the registrant to be managed by the Slaytons without consultation with or approval by the board as a whole.
>
> "On the basis of the record it is evident that the directors failed to discharge their duties and responsibilities as directors, and failed to perform the functions which the prospectus represented they were performing. The prospectus represented that the operations of the registrant are under the supervision and direction of its board of directors, and failed to point out that the Slaytons were assuming the functions of the board of directors in directing the operations of registrant. * * *"

What is the extent of the liability of these grossly negligent directors? Counsel for one of them says that his client's conduct did not cause damage to Funds. He says the investment advisory fees paid Associates were computed at the rate prevalent in the industry. He argues that Funds did get the advice and concludes by contending that

there is no evidence that such advice could have been obtained for less from some other source.

I think the answer is that even an average attention to duty by the directors would have revealed the fact that the Slaytons were being paid for services being rendered by Model. I conclude that because of this negligence these directors must be held jointly and severally liable with Slayton Associates and Model for the payments made to Associates after June 12, 1954. This follows because Funds was paying Associates without receiving from it the requisite consideration. It may well have been that the management fee arrangement could have been adjusted or eliminated in the light of the function performed by Model solely in return for Funds' brokerage business. *Hawkins v. Merrill, etc., D.C.*, 85 *F.Supp.* 104.

Finally, I come to plaintiffs' claim that the directors are jointly and severally liable for the losses resulting from the sale and repurchase of the same securities as heretofore discussed.

As I have determined in connection with Model's liability, the record demonstrates that the Fund was damaged by losses and costs incurred in connection with the sale and repurchase of stocks in violation of the investment policy of Funds. I will not repeat the basis upon which I reached that conclusion. The sole issue here is whether these directors are jointly and severally liable for the damages which are ultimately determined under this aspect of the case.

I am satisfied that these directors are liable because I think it is clear that had they discharged their responsibilities as to general supervision they would have discovered these violations of Funds' investment policy. It is evident that the negligence of these directors can be considered a proximate cause of this loss to Funds. I therefore conclude that these directors are, to the extent indicated, jointly and severally liable with the Slayton defendants and Model. The amount of their liability under this item will be determined in conjunction with the ascertainment of Model's liability under this aspect of the case.

An order must await the determination of the matters left open herein.