SAM GLASSCOCK III

## COURT OF CHANCERY
## OF THE
## STATE OF DELAWARE

COURT OF CHANCERY COURTHOUSE
34 THE CIRCLE
GEORGETOWN, DELAWARE 19947

Date Submitted: January 7, 2015
Date Decided: January 14, 2015

Joseph Alfred
7 Flower Road
Somerset, New Jersey 08873

Robert W. Whetzel
Travis S. Hunter
Richards Layton & Finger
One Rodney Square
920 N. King Street
Wilmington, Delaware 19801

Re:   *Joseph Alfred v. Walt Disney Co., et al.*
      Civil Action No. 10211-VCG

Dear Mr. Alfred and Counsel:

This matter is before me on the Defendants' motions to dismiss a complaint sounding in contract, filed by the Plaintiff, Mr. Alfred, *pro se*. That Complaint is remarkable. It is in my experience a unique example of the pleader's art. It cites to the epic of Gilgamesh, Woody Guthrie, the Declaration of Independence, Noah and The Great Flood, *Game of Thrones*, *Star Wars Episode V: The Empire Strikes Back*, *Star Trek*, President Obama, and Euclid's proof of the Infinity of Primes, among other references. It is well-written and compelling. In fact, it can be faulted only for a single—but significant—shortcoming: it fails to state a claim on which relief could be granted. Therefore, I grant the Defendants' Motions to Dismiss.

The Plaintiff, in succinct and pith-perfect fashion, stated the gravamen of his action as follows: "If the Plaintiff needed to sum up this entire case in one sentence, it is this: Two executives of the Disney Company are stalling the next evolution of human transportation on this planet."[1]

In other words, the Defendants are holding back the flying car.[2]

## I. BACKGROUND FACTS

The following facts are taken from the Complaint. Defendant Walt Disney Company ("Disney" or the "Company") is the owner of a trademark for the T-65 X-wing fighter plane, a (presumably) thus-far fictional vehicle created in connection with the movie *Star Wars Episode IV: A New Hope*.[3] Disney expects to premiere a new installment of the *Star Wars* movie series in December of 2017. Non-party Terrafugia, Inc. ("TI") is an enterprise that the Plaintiff believes capable of producing a vertical take-off and landing vehicle, which vehicle the user could program for flight to a given destination and which would then be remotely operated by the FAA. The vehicle would travel between the realms of an automobile and airplane, "creat[ing] Woody Guthrie's endless skyway,"[4] and

---

[1] Compl. ¶ 1.

[2] It is perhaps coincidental that it is Disney's media competitor, Fox, whose creation, the Stonecutters, hold back the *electric* car. *See The Simpsons: Homer the Great* (Fox television broadcast Jan. 8, 1995).

[3] For the unfamiliar reader, the Plaintiff explains thusly: "The X-wing was the vehicle used by the character Luke Skywalker to destroy the Death Star; the ultimate symbol of evil in all of recorded human literature." Compl. ¶ 4.

[4] *Id.* ¶ 1.

would be priced to be available to the masses. It would revolutionize travel and reduce the need for maintenance and improvement of existing roadway infrastructure.

In the Plaintiff's conception, this vehicle would be built to resemble the X-wing, which would promote its acceptance by the public. Plaintiff has developed a marketing plan, pursuant to which Disney would license TI the right to use the X-wing name and appearance, TI would develop the previously described short take-off and landing programmable remotely controlled vehicle in the appearance of an X-wing (the "Flying Car"),[5] and the Plaintiff would raise the necessary funds for development of the Flying Car through internet pledges of $10,000, each entitling the investor to a ride in the Flying Car.

Crucial to the Plaintiff's promotional idea would be the support of Disney, with its extensive existing connections, through its ownership of the *Star Wars* franchise and otherwise, to flying cars.[6] The Flying Car envisioned by the Plaintiff would be promoted via tie-ins to Disney's new *Star Wars* movie, and would be

---

[5] The Complaint uses various terms to describe the Plaintiff's concept: among them the "affordable automated personal airplane," Compl. ¶ 2, the "affordable vertical takeoff and landing automated personal airplane," *id.* ¶ 7, and the "World's First Flying X-wing," *id*. ¶ 28. According to the Plaintiff, TI describes the concept, more manageably, as the "flying car." *See* Pl.'s Answer to Walt Disney Co.'s Mot. to Dismiss at 3.

[6] At oral argument on the Motion to Expedite, the Plaintiff argued that the Disney relationship with the Flying Car was even more crucial because the movie *Back to the Future Part II* (Universal Pictures 1989), set in 2015, also featured flying cars. In this regard, I note that Disney has been tantalizing the public with depictions of flying cars, at the same time failing to promote those vehicles' actual production as functioning transportation, since at least the time of my long-ago boyhood. *See, e.g.,* Charles Spain Verral, *Walt Disney's The Flying Car* (Golden Press, 1961), Ex. A, attached; *The Absent-Minded Professor* (Walt Disney Prods. 1961).

publicized during halftime of a football game featuring the unbeaten football Seminoles of Florida State University,[7] to be televised on two Disney properties, the American Broadcasting Company and ESPN.

Implied in the Complaint is that the Plaintiff made an unsolicited proposal involving *Star Wars* marketing to Disney. He was then contacted by someone at Disney to arrange a conference call scheduled for July 22, 2014. In anticipation of this call, the Plaintiff sent Disney a slide deck laying out the proposal described above. On July 22, the conference call took place among Vanessa Blakely, an officer of TI; the Plaintiff; and Divya Dalal, a Disney employee.[8] The Complaint does not allege the specifics of that conversation. However, shortly after the telephone conference, the Plaintiff called the office of Defendant Bob Chapek, an officer of Disney, to further discuss the proposed promotion of the Flying Car. Chapek did not take this call. The Complaint is somewhat unclear as to what happened next, but it appears that on the same day, July 29, 2014, Chapek's executive assistant, a Disney paralegal, or a "nameless Disney attorney" called or emailed the Plaintiff and stated that Disney was not interested in his proposal. According to the Plaintiff, participating in the July 22 telephone call represented a change in Disney's prior policy not to accept unsolicited proposals, which he took

---

[7] *But see 2015 Rose Bowl* (ESPN television broadcast Jan. 1, 2015). I note, however, that the Plaintiff's Complaint was filed in advance of this ill-fated (from the point of view of the Plaintiff and the Seminoles) athletic contest.

[8] The Complaint describes Dalal as the "licensing lieutenant" for Disney. *See* Compl. ¶ 16.

as a guarantee that his proposal would be accepted.[9] The individual Defendants, Chapek and Robert A. Iger, the Chief Executive Officer and Chairman of the Board of Disney, are, according to the Complaint, both residents of California. They moved to dismiss for lack of jurisdiction under Chancery Court Rule 12(b)(2) and for failure to state a claim upon which relief can be granted under Chancery Court Rule 12(b)(6). The Company itself also moves to dismiss under Rule 12(b)(6). For the reasons that follow, those Motions must be granted.

## II. ANALYSIS

### A. Motion to Dismiss under Rule 12(b)(2)

Delaware jurisdiction over an out-of-state defendant can arise by statute, such as the long-arm statute,[10] or, as alleged by the Plaintiff here, 10 *Del. C.* § 3114, which provides for service of process on out-of-state individuals who are directors or officers of Delaware corporations, who are implied to have consented to such jurisdiction. Once a determination is made that statutory service of process has been perfected, then a separate inquiry as to the constitutionality of the

---

[9] *See id.* ¶ 25 ("The Walt Disney Corporation created an implied contract with the plaintiff when it changed its own policy against accepting unsolicited submissions by a third party. The plaintiff can infer an implied promise based on circumstances that exist in the ordinary course of dealing and common understanding. Why even take the teleconference call on July 22, 2014 if there were not mutual agreement that this campaign would be successful for the Disney Corporation? There is an often used mathematical principle to solve difficult theorems: to prove something, disprove the opposite (See Euclid's proof on the infinity of prime numbers).").

[10] *See* 10 *Del. C.* § 3104.

exercise of that jurisdiction is required.[11]  Because, as discussed below, I find that jurisdiction was not perfected, I need not reach the constitutional question.

The Plaintiff, in a submission following his reply brief, concedes that he has not perfected process over Chapek; Chapek's Motion to Dismiss, therefore, is granted.[12]  I next address whether jurisdiction has been obtained over Iger.

The Plaintiff, noting, I am sure, that there is a tide in the affairs of men which, taken at the flood, leads on to fortune,[13] alleges Iger has missed the boat; he argues that, in presumably causing Disney to not take the opportunity to participate in the production of the Flying Car, which would then be available and desirable to the mass of humanity—an opportunity that, if seized would have resulted in Disney's great financial benefit—Iger has breached fiduciary duties to the Corporation.  The Plaintiff, however, does not purport to sue derivatively on behalf of the Company.[14]  Instead, the Plaintiff states that Iger has caused Disney to breach a contract with him resulting in damages.[15]

---

[11] *See, e.g., Hercules Inc. v. Leu Trust & Banking (Bahamas) Ltd.*, 611 A.2d 476, 480–81 (Del. 1992).

[12] Pl.'s Final Answer at 3.  I note that the Plaintiff's "Final Answer" was submitted after briefing on the Motions to Dismiss had concluded.  Because of this Court's flexibility in addressing claims brought by self-represented litigants, I have read and considered this submission. *See, e.g., Durham v. Grapetree, LLC*, 2014 WL 1980335, at *5 (Del. Ch. May 16, 2014) ("[A]lthough 'self-representation is not a blank check for defect,' this Court has the discretion to 'exhibit some degree of leniency toward a *pro se* litigant, in order to see that his case is fully and fairly heard.'" (footnotes omitted)).

[13] *See* William Shakespeare, *Julius Caesar*, act 4, sc. 3.

[14] *See* Pl.'s Answer to Def. Chapek's and Iger's Mot. to Dismiss at 1 ("Plaintiff does not allege to sue on behalf of [the] shareholders; however Plaintiff's actions in contracting with the

6

The Plaintiff concedes that Iger is a resident of California and does not allege any connections between Iger and the State of Delaware other than the fact that he is an officer and director of Disney, a Delaware corporation. The Plaintiff himself is a New Jersey resident and does not contend that the contract at issue was created in Delaware. The Plaintiff, however, relies on 10 *Del. C.* § 3114 to provide for service of process to obtain jurisdiction over Iger. According to the Plaintiff, in allowing Disney to breach *its* contractual obligations to him, Iger was acting in his capacity as CEO of the Company, thus, in Plaintiff's view, making him subject to jurisdiction under Section 3114.[16] But Section 3114 does not apply to contract claims asserted by third parties against a corporation; rather, it applies in actions alleging breach of fiduciary duties on the part of individual directors.[17] Although,

___

corporation were formulated under the premise that true fiduciaries would always accept the Plaintiff's proposal.").

[15] *See* Compl. ¶ 30. The Plaintiff's damages relate to his plan to be compensated with Disney and Terrafugia stock, a deal which, if consummated, would be worth billions of dollars to him. By way of context, the Plaintiff's promotional scheme involving marketing $10,000 flights on the Flying Car is expected to bring in $930,000,000 by itself through an internet facilitator, Kickstarter. *Id.* ¶ 2. The Plaintiff does not seek a damage award, however, only specific performance and injunctive relief.

[16] The Plaintiff alleges that he sent an email to Iger, which informed him of the proposal. Pl.'s Answer to Def. Chapek's and Iger's Mot. to Dismiss at 3. When a Disney attorney contacted the Plaintiff, he or she allegedly said, "It is the official position of the executive team that we are not interested." *Id.* at 4. Because Iger had received the proposal, the Plaintiff contends that this statement was made at Iger's direction. *See id.* The statement that Disney was not interested represents, to Plaintiff, the breach of contract.

[17] *See Ruggiero v. FuturaGene, plc.*, 948 A.2d 1124, 1132–33 (Del. Ch. 2008) ("Directors of a corporation, however, are not parties to a contract simply because the corporation is a party to a contract. . . . While 10 *Del. C.* § 3114 does authorize service over directors, trustees, or members of the governing body of a Delaware corporation, it does so only where the cause of action is based on such an individual's breach of fiduciary duty owed to the corporation and its owners. . . . [T]he wrongs alleged here are contract claims unconnected with the internal affairs

as described above, the Plaintiff's briefing on the Motions to Dismiss alludes to breaches of fiduciary duties when Iger allegedly caused Disney to reject the Flying Car proposal, that claim was not asserted in the Complaint and would, at any rate, belong to the Company, not the Plaintiff. Further, the Plaintiff concedes that Iger himself is not a party to the alleged contract between Disney and the Plaintiff.[18] There simply is no basis by which the Plaintiff has shown that jurisdiction extends to Iger; therefore, this action against him must be dismissed. In any event, as described below, there is no underlying contract pursuant to which the individual Defendants could be held liable.

*B. Motions to Dismiss under Rule 12(b)(6)*

Both Disney and the individual Defendants moved to dismiss under Rule 12(b)(6), alleging the Complaint states no claim under which relief can be granted.

---

or corporate governance issues that Delaware law is especially concerned with. . . . [Thus, the plaintiff] failed to establish that . . . 10 *Del. C.* § 3114 applies." (footnotes and internal quotation marks omitted)); *Lisa, S.A. v. Mayorga*, 2009 WL 1846308, at *5 (Del. Ch. June 22, 2009) ("Section 3114 provides for personal jurisdiction over a nonresident director or officer of a Delaware corporation when sued for acts performed in his capacity as a director or officer. More narrowly, however, 'Delaware cases have consistently interpreted [Section 3114] as . . . [applying] only in connection with suits involving the statutory and nonstatutory fiduciary duties of nonresident directors.' Moreover, the conduct alleged must have constituted a breach of fiduciary duty to a Delaware corporation for which the plaintiff has standing to sue—that is a duty which runs to the plaintiff either directly or derivatively." (footnotes omitted)), *aff'd*, 993 A.2d 1042 (Del. 2010).

[18] Pl.'s Answer to Def. Chapek's and Iger's Mot. to Dismiss at 2 ("Plaintiff does not allege that a contract was created between the plaintiff and [individual] Defendants."). Because the individual Defendants were not parties to the alleged contract, they cannot be held liable. *See, e.g., Wallace ex rel. Cencom Cable Income Partners II, Inc., L.P. v. Wood*, 752 A.2d 1175, 1180 (Del. Ch. 1999) ("It is a general principle of contract law that only a party to a contract may be sued for breach of that contract. Indeed, Delaware law clearly holds that officers of a corporation are not liable on corporate contracts as long as they do not purport to bind themselves individually." (footnote omitted)).

Under that Rule, I must take the allegations of the Complaint as true and draw all reasonable inferences therefrom. The matter will be dismissed only where it is not reasonably conceivable that the Plaintiff could prevail.[19]

The Plaintiff first argues that a contract exists that may be implied in fact based on Disney agreeing to relax its policy not to consider unsolicited proposals. According to the Plaintiff, this contract arose when Disney agreed to hear his proposal. But in order to infer a contract from the behavior of the parties, I must be able to conclude that the requisites of a contract have been met.[20] That behavior "is evaluated from the perspective of a reasonable person, considering all of the attendant circumstances."[21]

---

[19] *Cent. Mortgage Co. v. Morgan Stanley Mortgage Capital Holdings LLC*, 27 A.3d 531, 535 (Del. 2011).

[20] *See, e.g., Phillips v. Wilks, Lukoff & Bracegirdle, LLC*, No. 671,2013, 2014 WL 4930693, at *3 (Del. Oct. 1, 2014), *as corrected* (Oct. 7, 2014) ("A contract may exist as either an express contract or an implied-in-fact contract because they are legal equivalents—the first being arrived at by language and the second by actions that demonstrate a meeting of the minds." (internal quotation marks omitted)); *Capital Mgmt. Co. v. Brown*, 813 A.2d 1094, 1098 (Del. 2002) ("An implied contract is one inferred from the conduct of the parties, though not expressed in words. The parties' intent and mutual assent to an implied-in-fact contract is proved through conduct rather than words." (internal quotation marks and footnote omitted)); *Creditors' Comm. of Essex Builders, Inc. v. Farmers Bank*, 251 A.2d 546, 548 (Del. 1969) ("A contract will be implied in fact only when the Court may fairly infer such an intent from the evidence; it represents the presumed intention of the parties as indicated by their conduct."); *Trincia v. Testardi*, 57 A.2d 638, 642 (Del. Ch. 1948) ("[A]n express agreement is arrived at by words, while an implied agreement is arrived at by acts. Consequently, the difference seems to be only in the evidence by which the agreement is proved.").

[21] *Levey v. Brownstone Asset Mgmt., LP*, 2014 WL 3811237, at *10 (Del. Ch. Aug. 1, 2014) (quoting 1 *Williston on Contracts* § 1:5 (4th ed.2014)) (internal quotation marks omitted), *reargument denied,* (Del. Ch. Aug. 22, 2014).

9

A contract requires an offer, acceptance of the offer, and consideration passing between the parties.[22] There are simply no allegations in the Complaint from which I can infer that Disney agreed to do anything, let alone what the terms of that "anything" might have been. At most, the Complaint alleges that Disney, contrary to its usual policy against accepting unsolicited proposals, attended a telephone conference at which the Plaintiff could pitch his ideas, which the Company then rejected. That does not state a contractual claim.

The Plaintiff also argues that he is entitled to relief under a theory of promissory estoppel. Promissory estoppel requires that the defendant make a promise, that the promisor expected action by the promisee in reliance, that the promisee acted to his detriment in reasonable reliance, and that equity requires relief.[23] The "promise" that Plaintiff points to is Disney's willingness to hear his proposal. In reliance on that willingness, the Plaintiff sent Disney a slide deck to describe the promotion and licensing that he wanted from Disney. If Disney's promise was to give the Plaintiff's ideas an airing, despite its prior policy not to consider unsolicited proposals, they complied with that promise. The promise to

---

[22] *See, e.g., Roam-Tel Partners v. AT&T Mobility Wireless Operations Holdings Inc.*, 2010 WL 5276991, at *6 (Del. Ch. Dec. 17, 2010).

[23] *See, e.g., Lord v. Souder*, 748 A.2d 393, 399 (Del. 2000) ("In order to establish a claim for promissory estoppel, a plaintiff must show by clear and convincing evidence that: (i) a promise was made; (ii) it was the reasonable expectation of the promisor to induce action or forbearance on the part of the promisee; (iii) the promisee reasonably relied on the promise and took action to his detriment; and (iv) such promise is binding because injustice can be avoided only by enforcement of the promise.").

hear a proposal out, however, cannot be reasonably relied upon as a promise to consummate a contract. There is simply no basis for the imposition of relief under a rubric of promissory estoppel.

In both his contract and estoppel claims, the Plaintiff makes essentially the same argument: (1) he pitched a proposal to Disney that would facilitate the production of the Flying Car by a third party in a way that would benefit that third party, the Plaintiff himself, Disney, the United States, and mankind; (2) it was such a flawless and compelling proposal that Disney could not reasonably turn it down—yet Disney chose to do so; and, therefore, (3) for the good of the third-party manufacturer, the Plaintiff, Disney, the United States, and mankind, the Plaintiff seeks the equitable relief of a positive injunction directing Disney to license the X-wing design and "wholeheartedly support" the promotion of the X-wing Flying Car via tie-ins to upcoming *Star Wars* films, *Back to the Future*, and its televising of Florida State's unbeaten Seminole football team.[24] The Plaintiff's marketing proposal may strike one as far-fetched or, perhaps, brilliant. Nothing the Plaintiff has presented in his Complaint, however, indicates that any of the Defendants took any action which can bind them contractually or equitably to participate in the Plaintiff's scheme.

---

[24] *But see, again, 2015 Rose Bowl* (ESPN television broadcast Jan. 1, 2015).

## III. CONCLUSION

Robert Fulton was laughed at by his peers, as was Secretary Seward. Galileo faced the inquisition for promoting heliocentric theory. Stravinsky's *Rite of Spring* caused a riot when first played. The Impressionists' early work was considered unsalable, and Van Gogh "suffered for [his] sanity."[25] Plaintiff and his vision of a vertical take-off and landing flying vehicle—which vehicle would revolutionize transportation and save lives and resources—as well as his marketing plan to achieve economies of scale by generating demand through a tie-in to a similar vehicle made popular via cinema, may be of this ilk. If so, the Plaintiff should persevere; it reportedly took Edison over a thousand attempts to create the light bulb before he struck upon the carbon filament.[26] Because, however, the Plaintiff has failed to perfect jurisdiction over the individual Defendants, and has failed to state a claim against any of the Defendants, he is precluded from pursuing equitable relief in aid of the Flying Car in this action. An order accompanies this Letter Opinion.

---

[25] *See* Don McLean, *Vincent*, *on* American Pie (United Artists Records 1971).

[26] In that connection, I note that even if the Plaintiff is correct that *Star Wars*' T-65 X-wing is unique because it was used to destroy "the ultimate symbol of evil in all of recorded human literature," there are many other cinematic fictional flying cars that might excite the public's imagination, beyond the X-wing and the model seen in *Back to the Future Part II* (Universal Pictures 1989). These include a flying Ford Model T, *see The Absent Minded Professor* (Walt Disney Prods. 1961) *and* Ex. A; a flying 1920's model custom racer based on autos created by Count Lewis Zborowski, *see Chitty Chitty Bang Bang* (United Artists 1968); and a flying Ford Anglia, *see Harry Potter and the Chamber of Secrets* (Warner Bros. 2002).

Sincerely,

/s/Sam Glasscock III

Vice Chancellor

**EXHIBIT A**



**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

JOSEPH ALFRED,                                          )
                                                       )
              Plaintiff,                    )
                                                       )
      v.                                               )  C.A. No. 10211-VCG
                                                       )
THE WALT DISNEY COMPANY,                 )
ROBERT A. IGER, and BOB CHAPEK     )
                                                       )
             Defendants.                 )

## ORDER

AND NOW, this 14th day of January, 2015,

The Court having considered Defendants Robert A. Iger and Bob Chapek's Motion to Dismiss and The Walt Disney Company's Motion to Dismiss (together, the "Defendants Motions to Dismiss"), and for the reasons set forth in the Letter Opinion dated January 14, 2015, IT IS HEREBY ORDERED that the Defendants Motions to Dismiss are GRANTED, and the Plaintiff's Complaint is DISMISSED with prejudice.

SO ORDERED:

                                     /s/ Sam Glasscock III
                                     Vice Chancellor